FILED

2024 Sep-27  AM 11:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **WENDY COCKRELL,** *individually and as parent and next friend of J.B.* | } } } } } } } | |
| **Plaintiff,** | } } } | |
| **v.** | } } } | **Case No.:  2:22-cv-01494-MHH** |
| **BESSEMER CITY BOARD OF EDUCATION,** | } } } } | |
| **Defendant.** | } } } | |

## MEMORANDUM OPINION AND ORDER

In this action, Ms. Cockrell challenges the decision of an independent hearing officer—an IHO—who found that the Bessemer City Board of Education did not fail to provide Ms. Cockrell's child, J.B., with a free and appropriate public education—FAPE—pursuant to the Individuals with Disabilities Education Act—the IDEA.  Ms. Cockrell has asked the Court to review the IHO's findings and provide relief under the IDEA.  (Doc. 1).  The Board has asked the Court to enter judgment on the administrative record in its favor on Ms. Cockrell's claims. (Doc. 25).  This opinion resolves the Board's motion.

The opinion begins with a discussion of the statutory framework for the IDEA and the procedural standards that a district court must use to evaluate the Board's

motion.  Consistent with those standards, the Court identifies the relevant evidence in the administrative record.  Finally, the Court evaluates the evidence under the governing legal standards.

## I.

Congress enacted the IDEA because Congress found that children with disabilities "were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'" *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 179 (1982) (bracketed text in *Rowley*) (quoting H.R. REP. NO. 94-332, at 2 (1975)).  The IDEA ensures that "children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).

Under the IDEA, a "child with a disability" may be a child with an intellectual or learning disability or a child with a serious emotional disturbance or a health impairment who, by virtue of the disability, "needs special education and related services."  20 U.S.C. § 1401(3)(A).  Under the IDEA, a "free appropriate public education" is:

special education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9)(A)-(D). "Special education" means "specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability." 34 C.F.R. § 300.39(a)(1).

A local educational agency or LEA must "conduct a full and individual initial evaluation" of a student who may have a disability. 20 U.S.C. § 1414(a)(1)(A). Then "a team of qualified professionals and the parent of the child" must determine whether the child is a "child with a disability" as defined by the IDEA who is eligible "for special education and related services." 20 U.S.C. § 1414(b)(4)(A). If the team determines that the child is a "child with a disability" who is eligible for special education and related services, then the team must develop, and the local educational agency must implement, an individualized educational plan or IEP for the child. 20 U.S.C. §§ 1414(d)(1)(A)(i), (2)(A).

An IEP must be "reasonably calculated to enable [a] child to make progress appropriate in light of [the child's] circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 404 (2017). An IEP includes "'a

statement of the child's present levels of academic achievement and functional performance,' 'a statement of Measurable Annual Goals,' and 'a statement of the special education and related services and supplementary aids and services … to be provided to the child.'" *L.J. by N.N.J. v. Sch. Bd. of Broward Cnty.*, 927 F.3d 1203, 1207 (11th Cir. 2019) (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i), 1414(d)(1)(B)). "[I]f [a] child is being educated in the regular classrooms of the public education system, [an IEP] should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Rowley,* 458 U.S. at 203-04.

A school district must "develop and conduct a yearly review of an [IEP] that addresses the student's unique needs." *R.L. v. Miami-Dade Cnty. Sch. Bd*., 757 F.3d 1173, 1177 (11th Cir. 2014) (citing 20 U.S.C. §§ 1412(a)(4), 1414(d)(4)(A)).   A school district must reevaluate a child with a disability "at least once every 3 years, unless the parent and the local educational agency agree that a reevaluation is unnecessary."   20 U.S.C. § 1414(a)(2)(B)(ii).   A school district must conduct a reevaluation sooner if the agency determines that a student's educational needs "warrant a reevaluation" or "if the child's parents or teacher requests a reevaluation," 20 U.S.C. § 1414(a)(2)(A), but a district ordinarily should not reevaluate a student more than once per year, 20 U.S.C. § 1414(a)(2)(B)(i).

A school district must educate a child with a disability in the "least restrictive environment" or LRE.  The LRE requirement compels a local educational agency to

"ensure that . . . [t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled…" 34 C.F.R. § 300.114(a)(2)(i). An IEP team must determine and identify in a student's annual IEP the student's LRE for the academic year.

A student's parents, teachers, and school administrators must collaborate to create an IEP that is responsive to a student's needs. *R.L.*, 757 F.3d at 1177. Sometimes, the collaborative relationship may deteriorate, and the members of the IEP team may have differences of opinion. *R.L.*, 757 F.3d at 1177-78. When that happens, the school or the student's parents may file a complaint and pursue a due process hearing before an IHO to resolve the dispute. *R.L.*, 757 F.3d at 1177-78. "The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 62 (2005). If the student's parents or the school disagree with the IHO's decision, either may appeal the decision by filing a civil suit either in state court or in a United States District Court. 20 U.S.C. § 1415(i)(2)(A). Ms. Cockrell chose the latter.

A district court must review "the evidence presented to the [IHO] and may hear additional evidence if needed." *R.L.*, 757 F.3d at 1178 (citation omitted); *see* 20 U.S.C. § 1415(i)(2)(C)(ii). After reviewing the available evidence, a district court

may issue a "judgment on the record based 'on the preponderance of the evidence,' 20 U.S.C. § 1415(i)(2)(C)(iii), even when facts are in dispute." *R.L.*, 757 F.3d at 1178 (quoting *Loren F. v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir. 2003)). When evaluating the evidence, a district court must give "due weight" to the IHO's findings, particularly those that rest upon educational expertise, and "the court must be careful not to substitute its judgment for that of the state educational authorities." *Walker Cnty. Sch. Dist. v. Bennett*, 203 F.3d 1293, 1297 (11th Cir. 2000); *see also Rowley*, 458 U.S. at 206 (stating that the "provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review"); *Loren F.*, 349 F.3d at 1314 n.5 (citing Sixth Circuit decisions for the proposition that the degree of a district court's deference to an IHO's findings turns on the extent to which the findings involve educational expertise).

A district court must accept an IHO's findings as prima facie correct. *Loren F.*, 349 F.3d at 1314 n. 5. A district court may "accept the [IHO]'s conclusions that are supported by the record and reject those that are not." *R.L.*, 757 F.3d at 1178 (citing *Loren F.*, 349 F.3d at 1314). When a district court rejects a hearing officer's conclusions, the district court must explain the reasons for doing so. *R.L.*, 757 F.3d at 1178 (citing *Loren F.*, 349 F.3d at 1314 n.5).

### III.

With Ms. Cockrell's consent, J.B. first was assessed for eligibility for an IEP in November 2017 when J.B. was in the fourth grade. (Doc. 23-3, pp. 5-8, 10). J.B. was referred for an assessment because he was struggling to acquire basic reading and math skills, had difficulty producing written work, had few appropriate cognitive learning strategies and poor attention and concentration, and had difficulty staying on task. (Doc. 23-3, p. 5). J.B.'s grades were below average. (Doc. 23-3, p. 6). Work samples from mid-December 2017 contained the following scores: vocabulary test – 17/100, math test – 30/100, math classwork – 0/100, and multiplication worksheet – 14/100. (Doc. 23-3, p. 14). To evaluate J.B.'s possible need for special education, his vision, hearing, IQ, and achievement were assessed, and his teachers provided work samples and classroom observations. (Doc. 23-3, p. 18).

On January 25, 2018, the IEP team met to review J.B.'s initial assessments. (Doc. 23-3, pp. 13-17). J.B. could identify letters and sounds, blend words, and add and subtract single digits. (Doc. 23-3, p. 20). In reading, J.B. could "answer very basic comprehension questions from material" that was read aloud, but J.B. struggled to "use key details from the text to answer comprehension questions." (Doc. 23-3, p. 20). In math, J.B. could "complete basic single and multiple digit addition and subtraction without regrouping and borrowing" and knew 0, 1, 2, 5, and

10 multiples. (Doc. 23-3, p. 20). J.B. struggled with multiplication with other numbers and with basic division problems. (Doc. 23-3, p. 20). J.B. had an IQ score of 81, which was slightly below average, and a predicted achievement score of 88. (Doc. 23-3, pp. 16, 20).[1] On the Woodcock Johnson test, J.B. obtained a Broad Achievement Score of 51, which was below the average range. (Doc. 23-3, p. 20). His sub-scores in math ranged from below 40 to 54, and his reading sub-scores ranged from 56 to 76. (Doc. 23-3, p. 15). The difference between J.B.'s predicted achievement score and his Broad Achievement Score indicated that J.B. had a severe discrepancy between ability and achievement. (Doc. 23-3, p. 16). J.B.'s IEP team determined that he had a specific learning disability—an SLD. (Doc. 23-3, pp. 16-17). Ms. Cockrell attended the meeting and concurred in the team's conclusions. (Doc. 23-3, p. 17).

J.B.'s IEP team created an IEP for him for the 2017-18 school year. The IEP indicated that the district would send Ms. Cockrell Annual Goal Progress reports every nine weeks when the district issued report cards. (Doc. 23-3, p. 22). In reading, J.B.'s Measurable Annual Goals were to use details from text to answer comprehensive questions with 75% accuracy and to stretch and blend unfamiliar

---

[1] Ms. Cockrell testified that no one explained to her what these and other scores meant—whether these scores were good, average, or above average, but Ms. Cockrell did not ask what the scores meant. (Doc. 23-2, p. 8, tp. 26). Ms. Cockrell acknowledged that the school district did not hamper her ability to ask about the scores. (Doc.23-2, p. 27, tpp. 103-05).

words in and out of text with 75% accuracy.  (Doc. 23-3, pp. 23-24).  In math, J.B.'s Measurable Annual Goals were to complete multiple digit addition and subtraction problems with regrouping and borrowing with 75% accuracy and to complete multiplication problems with 75% accuracy.  (Doc. 23-3, pp. 25-26).  There are no progress reports or report cards in J.B.'s records for the 2017-18 school year.

On April 27, 2018, J.B.'s IEP team met to establish J.B.'s IEP for the 2018-19 school year.  (Doc. 23-3, p. 40).  Ms. Cockrell attended the IEP team meeting.  (Doc. 23-3, pp. 29, 40).   In reading, J.B.'s Measurable Annual Goals were to demonstrate comprehension of the central message or lesson from a story using key details with 75% accuracy and to use frequently used prefixes and suffixes to decode words with 75% accuracy.  (Doc. 23-3, pp. 33-34).  In math, J.B.'s Measurable Annual Goals were to complete multi-digit addition and subtraction problems and basic division problems with 75% accuracy.  (Doc. 23-3, pp. 35-36).  In science, J.B.'s Measurable Annual Goal was to determine and explain the differences between physical and chemical changes with 75% accuracy.  (Doc. 23-3, p. 37).  J.B. had two benchmarks for his reading and math goals and four for his science goal.  (Doc. 23-3, pp. 33-37).

J.B.'s IEP for the 2018-19 school year included special education instruction in the general education classroom twice weekly for 30 minutes.  (Doc. 23-3, p. 38).  J.B. also received supplementary aids and services, including a daily peer buddy, a

highly structured reading program, extra time to complete assignments and tests, an option to respond orally, and the ability to turn in his notes for a copy of the teacher's notes in all subjects.  (Doc. 23-3, p. 38).  There are no progress reports or report cards in J.B.'s records for the 2018-19 school year even though the IEP states that the reports will be sent to parents every nine weeks.  (Doc. 23-3, p. 32).

On April 26, 2019, J.B.'s IEP team met to revise his IEP for the 2019-20 school year, and Ms. Cockrell attended the meeting.  Ms. Cockrell expressed concern about J.B.'s transition from elementary school to middle school.  (Doc. 23-3, p. 47; *see also* Doc. 23-2, p. 11, tp. 40).  J.B.'s April 2019 SCANTRON assessments in math and reading were below average.  The IEP team indicated that his difficulties in reading and math "impact[ed] his ability to participate in the general education setting."  (Doc. 23-2, p. 47).  J.B. could add and subtract two-digit numbers, and he could read second and third grade texts "with minimal assistance."  (Doc. 23-3, p. 47).  J.B. had difficulty reading fluently and "organizing his ideas and thoughts when answering [reading] comprehension questions."  (Doc. 23-3, p. 47).

In math, J.B.'s Measurable Annual Goal was to complete two and three-digit addition and subtraction problems with 80% accuracy.  (Doc. 23-3, p. 49).  In reading, J.B.'s Measurable Annual Goal was to answer "how" and "why" questions with 80% accuracy after reading a text.  (Doc. 23-3, p. 49).  J.B. received special education services that included direct and explicit directions from special education

staff with reading and math assignments. (Doc. 23-3, p. 51). J.B. also received several supplementary services and accommodations such as peer and adult assistance with reading; frequent breaks and checks from teachers; repetitive instruction; reduced amount of work; word banks; color coded key words, concepts, and symbols in all subjects; and use of manipulatives. (Doc. 23-3, p. 51).

J.B.'s IEP for the 2019-20 school year indicated that the district would send Ms. Cockrell Annual Goal Progress reports every nine weeks when the district issued report cards. (Doc. 23-3, p. 48). J.B. had two benchmarks for his reading goals and two for his math goals. (Doc. 23-3, pp. 49-50). The school district sent Ms. Cockrell a copy of J.B.'s special education rights on April 26, 2019 and a copy of the 2019-20 IEP on April 29, 2019. (Doc. 23-3, p. 53).

J.B.'s grades for the first three quarters of the 2019-20 school year appear in his school record and indicate that with accommodations, he still struggled in all subjects but PE. (Doc. 23-3, pp. 59-63). J.B. was in sixth grade. For the first nine-weeks in reading, J.B. completed two assessments and one test. He received scores of 70/100 and 50/100 on the assessments and a score of 65/100 on the test. (Doc. 23-3, p. 59). With accommodations/modifications, for his first nine-week benchmark assessment in math, J.B. scored 60 points out of a possible 100 points. (Doc. 23-3, p. 59). In social studies, in the first nine-week period, he had no score for his first benchmark assessment, a score of 41/100 for his second benchmark

assessment, and a score of 0/100 for his third benchmark assessment. (Doc. 23-3, p. 60). Overall, in the first nine-week period, he received an A in PE, Cs in reading, math, and social studies, and a D in science. (Doc. 23-3, pp. 59-60). The second and third nine weeks are similar. J.B. received As in PE, a B and a C in reading, a C and a D in math, a D and a B in English, and Cs in science and social studies. (Doc. 23-3, pp. 61-63). His score on his second nine-week math benchmark was 60/100. J.B. did not receive scores, and does not appear to have completed, four out of five math fact tests. (Doc. 23-3, p. 61). In the third nine weeks, J.B. did not receive scores, and does not appear to have completed, four math facts tests. (Doc. 23-3, p. 62).[2] The record does not contain a report for the fourth nine weeks of the 2019-20 school year.

The record contains a January 2020 Annual Goal Progress Report concerning J.B.'s benchmarks that contains benchmark assessments for the first two nine-week periods of the 2019-20 school year. (Doc. 23-3, p. 64). The report indicates that J.B. made "some" progress toward the math and reading goals, and mastery was anticipated. (Doc. 23-3, p. 64). Ms. Cockrell signed the progress report on January

_____

[2] The record contains test scores for the first three quarters of the 2019-20 school year that the Court does not completely understand. (Doc. 23-3, pp. 93-94). The tests are pretests, posttests, and benchmark tests. Some of the tests are classroom tests, and some are district tests. Some scores are marked "Not Available," some tests are labeled "Spoil," and some are labeled "Finished." Most of the scores appear to be failing scores, but the Court is not confident that it is interpreting the scores correctly. The record also contains a "Suggested Learning Objectives" document dated April 25, 2020 that the Court does not completely understand. The document appears to be a state assessment form. (Doc. 23-3, pp. 95-98).

8, 2020. (Doc. 23-3, p. 64).  The record does not contain benchmark assessments for the third and fourth nine-week periods of the 2019-20 school year.

On March 3, 2020, Ms. Cockrell wrote a letter in which she asked to meet with J.B.'s teachers and expressed her concern about his progress.  (Doc. 23-3, p. 71).  Ms. Cockrell stated that she needed J.B.'s teachers to send J.B.'s homework home so she could help J.B. at home and stated that J.B. needed one-on-one instruction, which he told Ms. Cockrell he was not receiving often.  (Doc. 23-3, p. 72).  Ms. Cockrell stated that she previously had asked that his homework be sent home each day, to no avail. (Doc. 23-3, pp. 71-72).

J.B.'s IEP team met on March 12, 2020 to review Ms. Cockrell's concerns. (Doc. 23-3, pp. 57-58).  The team discussed the need for extended year services. (Doc. 23-3, p. 58).  The Court has not found an update to J.B.'s 2019-20 IEP based on the March 2020 meeting.[3]

On May 28, 2020, J.B.'s IEP team met to revise the IEP For the 2020-21 school year, and Ms. Cockrell appears to have attended the meeting.  (Doc. 23-3, pp.

---

[3] From the way in which J.B.'s school records are organized, it appears that the Board prepared a printout of J.B.'s grades for the first three quarters of the 2019-20 school year (discussed above and located at Doc. 23-3, pp. 59-63), and produced an annual goal progress report for the first two quarters of the year (discussed above and found at Doc. 23-3, p. 64), for purposes of the March 12, 2020 meeting.  There is no indication that the Board sent grades or progress reports to Ms. Cockrell every nine weeks as J.B.'s IEPs required.

75-86).[4]  J.B.'s student profile highlighted Ms. Cockrell's concerns that J.B. needed assistance to complete homework, and Ms. Cockrell asked for worksheets to be sent home as needed.  (Doc. 23-3, p. 78).  J.B.'s achievement series testing in 2019-20 revealed that J.B. could use drawings to solve addition and subtraction problems, "identify similar shapes and figures using words," "tell time on a digital clock," "decompose numbers between 10 and 20," decode words with common Latin suffixes and one-syllable words, identify the initial sound in words, "distinguish letters from words," and "spell simple words phonetically."  (Doc. 23-3, p. 78).  In math, J.B. showed strength in several areas including fractions, decimal matching, dividing decimals, adding and subtracting decimals, comparing and ordering integers, and distributive property.   (Doc. 23-3, p. 81).   J.B. struggled with "multiplying decimals, math facts, equivalent ratios, . . . ordering rational numbers, [] one-step equations," and other grade-level mathematical skills.  (Doc. 23-3, p. 81). In reading, J.B. showed progress in several areas including word endings, narrative writing, and summarizing and making inferences.  (Doc. 23-3, p. 83).  J.B. continued

---

[4] The administrative record contains a notice and invitation for the May 2020 IEP team meeting, (Doc. 23-3, p. 75), but this meeting is not documented as other meetings are.  The final page of J.B.'s 2020-21 IEP reflects an amendment made in November 2020 and lists the IEP team-members who attended the November 2020 meeting to update the 2020-21 IEP. (*See* Doc. 23-2, p. 86).  The record does not contain the list of attendees at the May 2020 IEP team meeting, but the IEP team signed an IEP on May 28, 2020.  (Doc. 23-3, p. 89).

to struggle with spelling, writing, plural nouns, using context clues, comprehension, research projects, and essays.  (Doc. 23-3, p. 83).[5]

In math, J.B.'s Measurable Annual Goal in his 2020-21 IEP was to convert a rational number to a decimal using long division on 3 out of 4 trials with 80% accuracy.  (Doc. 23-3, p. 81).  In reading, J.B.'s Measurable Annual Goal was to be able to cite textual evidence to support analysis and draw inferences from the text on 4 out of 5 trials with 80% accuracy.  (Doc. 23-3, p. 83).  J.B. received special education in reading and math twice a week in the resource room from the special education staff.  (Doc. 23-3, p. 84).  J.B. also received several supplementary services and accommodations such as copies of notes, extended time to complete work and assessments, and small group instruction.  (Doc. 23-3, pp. 84, 87-88).

J.B.'s IEP for the 2020-21 school year indicated that the district would send Ms. Cockrell Annual Goal Progress reports every nine weeks when the district issued report cards.  (Doc. 23-3, p. 80).  J.B. had two benchmarks for his reading goals and four for his math goals.  (Doc. 23-3, pp. 81-83).  The school district sent

_____

[5] Included in the materials associated with J.B.'s 2019-20 IEP is a Student Interest Survey that J.B. completed.  In response to the prompt, "What is the best thing you remember learning about last year?" J.B. responded, "i lean math is my best thang."  (Doc. 23-3, p. 65).  An adult completed the same form and wrote that J.B.'s response to the question was, "Math because the teacher told me [it] is important to learn math."  (Doc. 23-3, p. 68).  Another question on the survey asked J.B. to identify his "Favorite song and/or music artist."  (Doc. 23-3, pp. 65, 68).  J.B. replied, "hip hop." (Doc. 23-3, p. 65).  The adult who recorded J.B.'s answers wrote, "classical music."  (Doc. 23-3, p. 68).

Ms. Cockrell a copy of J.B.'s special education rights and a copy of the 2020-21 IEP on May 28, 2020.  (Doc. 23-3, p. 86).

In November 2020, J.B.'s IEP team met again and decided that J.B. should be reevaluated.  Ms. Cockrell attended the meeting and consented to the reevaluation. (Doc. 23-3, pp. 79, 86, 90, 103-06).  To determine J.B.'s continued eligibility for special education, the IEP team used assessments, records and reports from vision, hearing, intellectual, achievement, behavior, observation, language, grade, work samples, test results, and parent and teacher input.  (Doc. 23-3, p. 104).  J.B. passed the hearing and vision screenings.  (Doc. 23-3, p. 108).

The district did not update J.B.'s score on the Reynolds Intellectual Assessment Scales II.  (Doc. 23-3, p. 108).  On the Wechsler Intelligence Scale for Children Fifth Edition (WISC-V), J.B. had a full-scale IQ score of 70, 11 points lower than his score in 2018.  (Doc. 23-3, pp.16, 20, 108).[6]  On the Woodcock Johnson IV Test of Achievement, J.B. had a Broad Achievement Score of 59.  (Doc. 23-3, p. 108).  His math sub-scores ranged from 43 to 52.  His reading sub-scores ranged from 50 to 91.  (Doc. 23-3, p. 108).  J.B. had a 92 indexed score on the BASC-3 Teacher Rating Scales for behavior.  (Doc. 23-3, p. 109).  J.B. had appropriate instruction in math and reading provided by a highly qualified teacher, and he

---

[6] In the due process hearing, Dr. Holley stated that she believed that J.B.'s IQ score fell in the reevaluation because he was expected to know more as he aged.  (Doc. 23-1, p. 49, tp. 191).

participated in small group instruction.  (Doc. 23-3, p. 110).  He had documented standardized test scores and documented accommodations.  (Doc. 23-3, p. 110).[7] For the first quarter of the 2020-21 school year, he had scores of 60 in English, 71 in Reading, 60 in Math, 97 in Science, and 100 in Social Studies.  (Doc. 23-3, p. 110).  Teacher observations in math indicated that J.B. took notes while his teacher explained math concepts, but he was not able to keep pace with his classmates when the teacher provided sample problems for the class to complete.  He eventually gave up on solving the problems and became frustrated or upset.  (Doc. 23-3, p. 111).

With a Predicted Achievement Score of 81 and a Broad Achievement Score of 59, J.B. once again demonstrated a "severe discrepancy . . . between ability and achievement" and qualified for special education based on a specific learning disability.  (Doc. 23-3, p. 112).  The IEP team ruled out environmental/cultural/economic concerns, visual/hearing disabilities, intellectual disability, emotional disability, and motor disabilities as the primary cause of the impairment.  (Doc. 23-3, p. 112).  Ms. Cockrell attended the January 2021 meeting at which J.B.'s IEP team considered the results of his re-evaluation.  (Doc. 23-3, p. 113).

---

[7] J.B.'s reassessment report suggests that the State of Alabama changed standardized testing between 2019 and 2020.  (Doc. 23-3, p. 110).

On April 28, 2021, J.B.'s IEP team met to develop his IEP for the 2021-22 school year.  (Doc. 23-4, pp. 1-2).[8]  According to J.B.'s IEP profile, Ms. Cockrell had indicated that J.B. was "having a tough time completing work for his classes," and she was concerned about his reading level.  (Doc. 23-4, p. 2).  In reading and math, J.B. continued to show strengths, but he also continued to struggle in both areas, particularly with communicating his understanding of texts that he was reading and with "foundational skills for multiplication and division."  (Doc. 23-4, pp. 5-6).

In his IEP for the 2021-22 school year, in reading, J.B. had as his Measurable Annual Goal the ability "to refer to key details and examples in a text when explaining what the text says explicitly and when drawing inferences from the text with 80% accuracy on 3 out of 5 trials."  (Doc. 23-4, p. 5).  J.B. had two benchmarks in reading.  (Doc. 23-4, p. 6).  For math, J.B.'s Measurable Annual Goal was to be able to "multiply and divide within 100 with 80% accuracy on 4 out of 5 trials." (Doc. 23-4, p. 6).  J.B. had three benchmarks in math.  (Doc. 23-4, p. 6).  J.B. was to receive special education in reading for "citing textual evidence from a text with the use of worksheets, discussion questions, research projects, and discussions."

---

[8] The parties dispute whether Ms. Cockrell attended the meeting.  The 2021-22 IEP indicates that Ms. Cockrell did not attend the meeting.  (Doc. 23-4, p. 10).  At the September 2022 due process hearing, Ms. Cockrell testified that she did not miss an IEP meeting.  (Doc. 23-2, p. 15).  The point is not relevant to the Board's motion.

(Doc. 23-4, p. 8).  J.B. also was to receive special education instruction for "deficits in multiplication and division using manipulatives, fact sheets, timed drills, repeated practice, and observation."  (Doc. 23-4, p. 8).  J.B. received supplementary services and accommodations such as printed study guides for assessments with the correct answers, preferential seating, breaks, use of a calculator, and additional time.  (Doc. 23-4, p. 8).

J.B.'s Annual Goal Progress Report for the first nine weeks of the 2021-22 school year reflects that J.B. made "some progress" in "refer[ring] to key details and examples in a text when explaining what the text says explicitly and when drawing inferences from the text with 80% accuracy in 3 out of 5 trials."  (Doc. 23-4, p. 16). He also had made some progress towards multiplying and dividing "within 100 with 80% accuracy on 4 out of 5 trials."  (Doc. 23-4, p. 16).  On October 26, 2021, Ms. Cockrell signed the progress report.  Though J.B.'s IEP for the 2021-22 school year indicates that the district would send Ms. Cockrell Annual Goal Progress reports every nine weeks when the district issued report cards, (Doc. 23-4, p. 4), there are no other progress reports or report cards in J.B.'s records for the 2021-22 school year.

On May 9, 2022, J.B.'s IEP team met to develop J.B.'s IEP for the 2022-23 school year.  (Doc. 23-4, p. 31).  Ms. Cockrell attended the meeting.  (Doc. 23-4, p. 31).  In reading, J.B.'s performance was lagging significantly.  (Doc. 23-4, p. 22).

He had taken the STAR reading assessment in December 2021. The results indicated that J.B. was performing at an instructional level of 1.9. (Doc. 23-4, p. 22). His teachers reported that he was reading on a first-grade level and had significant difficulty with reading comprehension. (Doc. 23-4, p. 22). In math, J.B. had taken the STAR reading assessment in April 2022. His score was below grade level and "indicate[d] the need for urgent intervention." (Doc. 23-4, p. 22). The IEP indicates that for the third quarter of the 2021-22 school year, J.B. had the following grades: Enrichment 57/F, World History 60/D, English/Language Arts 63/D, Physical Science 79/C, Math 60/D, Business Tech 67/D. (Doc. 23-4, p. 22).[9] Screening indicated that J.B. lacked the knowledge and skills to complete an apprenticeship program. (Doc. 23-4, p. 25).

J.B.'s Measurable Annual Goal in math was to be able to "add and subtract within 1000 using place value strategies with 80% accuracy" by the end of the school year. (Doc. 23-4, p. 27). J.B. had two benchmarks for math. (Doc. 23-4, p. 27). J.B.'s Measurable Annual Goal in reading was to be able to "blend and decode words to read 2nd grade level text with 80% mastery." (Doc. 23-4, p. 28). J.B. had two benchmarks for reading. (Doc. 23-4, p. 28). J.B. was to receive special education services that included one 30-minute session each month concerning apprenticeships

---

[9] J.B.'s 2021-22 report cards are not in the record; only this third-quarter summary appears in J.B.'s 2022-23 IEP.

and job opportunities and financial management lessons and training.  (Doc. 23-4, p. 29).  Three times a week for 30 minutes, J.B. was to receive direct instruction on reading and math.  (Doc. 23-4, p. 29).  J.B. also was given accommodations that included having directions read aloud, a copy of the teacher's notes, preferential seating, a peer helper, use of a calculator, alternative test formats, small group testing, additional test time, and study guides, among other things.  (Doc. 23-4, pp. 29-30).

In May 2022, Ms. Cockrell raised concerns about J.B.'s IEP.  (Doc. 23-1, p. 59).  In a May 9, 2022 letter to Ms. Cockrell, Dr. Renee Holley, Director of the Board's Department of Special Education Services, offered J.B. "Compensatory Education" that was available Monday through Friday, June 6 to July 1, 2022, from 8:00 am to 3:00 pm.  (Doc. 23-4, p. 60; Doc. 23-5, p. 167).  In a letter dated May 19, 2022, Ms. Holley offered Ms. Cockrell paid tutoring sessions at Sylvan Learning Center, two hours per week, from June 6, 2022, to December 16, 2022.  (Doc. 23-4, p. 63; Doc. 23-5, p. 170).  The district also offered to pay Ms. Cockrell mileage for taking J.B. to the Sylvan tutoring sessions.  (Doc. 23-4, p. 63).

On July 20, 2022, Ms. Cockrell filed a complaint for a due process hearing.  (Doc. 23-1, pp. 2-9).  At the September 1, 2022 administrative hearing, Ms. Cockrell pursued several of the claims that she asserted in her state administrative complaint.  Ms. Cockrell alleged that the Board denied J.B. a FAPE when the Board failed to:

> identify and evaluate [J.B.] in all areas of suspected disability.
>
> develop and implement an IEP that complie[d] with state and federal laws and regulations that address all of [J.B.'s] disabilities; . . . provide [J.B.] special education services that were specifically designed to show meaningful gains in reading and math; and . . . identify and provide [J.B.] special education services that were based upon peer reviewed research.
>
> ensure the IEP team had accurate records and [updated] information; . . . provide progress reports; . . . write appropriately ambitious goals; and . . . conduct comprehensive/appropriate assessments to identify [J.B.'s] other disabilities

(Doc. 23-1, pp. 59-60; *see also* Doc. 23-1, pp. 26-28).[10] Ms. Cockrell and Dr. Holley testified at the hearing. (Doc. 23-2, pp. 6-60). The IHO also received exhibits from Ms. Cockrell and the Board, all but one of which were identical. (Doc. 23-1, p. 56).

On September 30, 2022, the IHO entered judgment in the Board's favor. (Doc. 23-1, pp. 55-65). Noting that Ms. Cockrell and Dr. Holley testified that J.B. had been identified and evaluated in all areas of suspected disability, the IHO found by a preponderance of the evidence that J.B. was not denied a FAPE with respect to proper identification and assessment of J.B.'s suspected disability. (Doc. 23-1, pp. 60, 63).[11] The IHO found that Ms. Cockrell's allegation regarding the Board's purported failure to develop and implement an IEP that complied with state and

---

[10] In the administrative complaint, on behalf of J.B., Ms. Cockrell also asserted that the Board failed to provide J.B. with certain services, therapies, and counseling. (Doc. 1-1, p. 3).

[11] Ms. Cockrell conceded this issue when she filed her complaint to appeal the IHO's decision. (Doc. 1, p. 11).

federal laws was "vague and overbroad."  (Doc. 23-1, p. 60).  The IHO added that J.B.'s IEPs "address[ed] deficits in math and reading."  (Doc. 23-1, p. 61).

The IHO found that the evidence did not show that J.B.'s IEPs "were not specifically designed to show meaningful gains in reading and math" because J.B. had not been held back in a grade level, Ms. Cockrell testified that J.B. earned his low but passing grades, and J.B.'s IEPs "address[ed] deficits in math and reading." (Doc. 23-1, p. 61; *see* Doc. 23-2, p. 26 (Ms. Cockrell's response to questions concerning grade inflation in which Ms. Cockrell indicated that aside from one teacher, she believed the grades J.B. received were his true grades)).  The IHO stated that none of the testimony at the administrative hearing demonstrated that J.B.'s IEPs "were not designed based upon peer research."  (Doc. 23-1, p. 61).

Regarding the Board's alleged failure to maintain accurate records for J.B. and document mastery of goals, the hearing officer determined that the deficiencies were procedural violations of the IDEA that did not "rise to the level of denial of FAPE."  (Doc. 23-1, p. 62).  The IHO stated:

> [Dr. Holley] offered a cogent and responsive explanation of why dates of mastery might be missing on IEPs because IEP teams may meet for annual meetings before the ending dates on IEPs.  Also, [Dr. Holley] explained that failure to master goals is not the same as receiving no benefit from special education.   However, [Dr. Holley] offered compensatory education to address deficiencies that may have occurred due to this procedural violation.  [Dr. Holley's] explanation of the rationale behind the offers of compensatory education, how the services would be tailored to remedy deficits, and how the number of hours

offered might change due to [J.B.]'s identified needs was cogent and responsive.

Second, [Ms. Cockrell] alleges that [the Board] denied [J.B.] a Free Appropriate Public Education ("FAPE") by failing to provide progress reports. This is a procedural violation. However, in the instant matter, this violation does not rise to a level of denial of FAPE. Mother testified that other team members did not explain anything to her in IEP meetings, but Mother felt able to ask other IEP team members for information. Mother chose not to ask questions in IEP meetings but did question school personnel "[w]hen it was necessary". In the instant matter, the testimony reflects that the District's failure to send the required progress reports to Mother did not significantly impede her ability to participate in IEP teams.

(Doc. 23-1, pp. 62-63). With respect to Ms. Cockrell's contention that J.B.'s IEP team did not write appropriately ambitious goals, the IHO found that there was no evidence that the stated goals "were not designed for Student to make progress based upon present levels of performance" and that J.B.'s annual goals in his IEP "were not the same from year to year and [were] written based upon Student's deficits identified from evaluations." (Doc. 23-1, p. 63).

Based on these findings, the IHO concluded that the Board did not deny J.B. a FAPE. (Doc. 1, p. 11).

## IV.

Ms. Cockrell contends that, in finding that the Board has not denied J.B. a FAPE, the IHO misapplied the law. (Doc. 1, p. 11). In her opposition to the Board's motion for judgment on the pleadings, Ms. Cockrell focuses on the lack of evidence of progress reports and mastery of skills in J.B.'s IEP documentation. Ms. Cockrell

also relies on information in J.B.'s IEPs that indicates that after five years of purported special education, J.B. has not advanced beyond first-grade achievement in reading and math.   (Doc. 26, pp. 15-17).   The Court focuses its analysis accordingly.

The instruction and services a student receives through an IEP must be "provided with an eye toward progress in the general education curriculum," and "every child should have the chance to meet challenging objectives." *Endrew*, 580 U.S. at 401-02 (quoting § 1414(d)(1)(A)(i)(IV)(bb)).   "After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement." *Endrew*, 580 U.S. at 399.  "A substantive standard not focused on student progress would do little to remedy the pervasive and tragic academic stagnation that prompted Congress to act." *Endrew*, 580 U.S. at 400.

A student "is only entitled to some educational benefit; the benefit need not be maximized to be adequate." *Devine v. Indian River Cnty. Sch. Bd.*, 249 F.3d 1289, 1292 (11th Cir. 2001). A student's IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew*, 580 U.S. at 399.  "[A] child has received a FAPE, if the child's IEP sets out an educational program that is reasonably calculated to enable the child to receive educational benefits." *Endrew*, 580 U.S. at 394 (citation and quotation marks omitted).  Though there is no bright line rule regarding the substance of an IEP,

"[t]he instruction offered must be '*specially* designed' to meet a child's '*unique* needs' through an '[*i*]*ndividualized* education program.'" *Endrew*, 580 U.S. at 394 (quoting 20 U.S.C. §§ 1401(29), (14) (italics in *Endrew*)). "An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Endrew*, 580 U.S. at 400 (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv)).

Because the substantive standard for an IEP is measured, in part, by a student's progress, a school district must assess that progress. For students like J.B. educated in the general classroom:

> "the system itself monitors the educational progress of the child."
> "Regular examinations are administered, grades are awarded, and
> yearly advancement to higher grade levels is permitted for those
> children who attain an adequate knowledge of the course material."
> Progress through this system is what our society generally means by an
> "education." And access to an "education" is what the IDEA promises.
> Accordingly, for a child fully integrated in the regular classroom, an
> IEP typically should, as *Rowley* put it, be "reasonably calculated to
> enable the child to achieve passing marks and advance from grade to
> grade."

*Endrew*, 580 U.S. at 400-01 (quoting and citing *Rowley*, 458 U.S. at 202-03). When an IEP offers a student needing special education "'merely more than *de minimis*' progress from year to year," the IEP "can hardly be said to have been offered an education at all." *Endrew*, 580 U.S. at 402-03. "The IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew*, 580 U.S. at 403.

A district court must assess "appropriate progress" on a case-by-case basis, considering "the unique circumstances of the child for whom [an IEP] was created." *Endrew*, 580 U.S. at 403-04.

The Eleventh Circuit has established a "two-part test to analyze whether a defendant has provided a qualifying FAPE in cases arising under the IDEA: '(1) whether the state actor has complied with the procedures set forth in the IDEA, and (2) whether the IEP developed pursuant to the IDEA is reasonably calculated to enable the child to receive educational benefit.'" *Phyllene W. v. Huntsville City Bd. of Educ.*, 630 Fed. Appx. 917, 919 (11th Cir. 2015) (quoting *Sch. Bd. of Collier Cnty. v. K.C.*, 285 F.3d 977, 982 (11th Cir. 2002)). A procedural defect in an IEP violates the IDEA if the defect:

> (I) impeded the child's right to a free appropriate public education;
>
> (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
>
> (III) caused a deprivation of educational benefits.

*T.P. v. Bryan Cnty. Sch. Dist.*, 792 F.3d 1284, 1293 (11th Cir. 2015) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). The educational benefits of an IEP are adequate if they rest on supporting facts and meet the student's individual needs. *Phyllene W.*, 630 Fed. Appx. at 920.

The IHO found that the Board's failure to provide progress reports and to document mastery of goals on J.B.'s IEPs were procedural violations of the IDEA.

(Doc. 23-1, p. 62).  The Court agrees.  The IHO also concluded that the procedural violations did not "rise to the level of denial of FAPE."  (Doc. 23-1, p. 62).  Here, the Court parts ways with the IHO.

To be sure, "[a] procedurally defective IEP does not automatically entitle a party to relief."  *Sch. Bd. of Collier County,* 285 F.3d at 982.  "In evaluating whether a procedural defect has deprived a student of a FAPE, the Court must consider the impact of the procedural defect, and not merely the defect *per se.*"  *Weiss v. Sch. Bd. of Hillsborough Cnty.*, 141 F.3d 990, 994 (11th Cir. 1998).  Here, the IHO considered only the nature of the procedural defects; the IHO did not consider the extent of the defects or the impact of the defects.

With respect to the extent of the procedural violations, Dr. Holley acknowledged that the documents before the IHO, and now before the Court, are the only documents that the district maintained concerning J.B. other than his initial registration forms.  (Doc. 23-3, p. 43, tp. 167).  The 105 or so pages of documents contains only one set of grades—J.B.'s grades for the first three quarters of the 2019-20 academic year.  (Doc. 23-4, pp. 59-63; *see also* Doc. 23-2, p. 43, tpp. 168-69).[12] Dr. Holley acknowledged that at the conclusion of each nine-week period, the district was supposed to provide to Ms. Cockrell a copy of J.B.'s grades and a

_____

[12] The 115-page document contains several cover pages and several blank pages that appear to have been inserted for purposes of litigation.  (See, *e.g.*, Doc. 23-3, pp. 1-3).

progress report, and the progress report should be documented in J.B.'s IEPs. (Doc. 23-2, p. 52, tpp. 203-05). Progress reports indicate the extent of a student's progress towards satisfying IEP annual goals. (Doc. 23-3, p. 64). Ms. Cockrell testified that she did not receive progress reports for J.B. (Doc. 23-2, p. 15, tp. 55). Dr. Holley acknowledged that there should be 24 progress reports in J.B.'s file, (Doc. 23-2, p. 44, tpp. 171-72); there are two, (Doc. 23-3, p. 64; Doc. 23-4, p. 16). That is less than 10% compliance with this procedural requirement.

The district was supposed to document mastery of benchmarks in J.B.'s IEPs in this format:

**BENCHMARKS:**
Include at least two Benchmarks for students working on Alternate Achievement Standards or for students in public agencies that require Benchmarks. Benchmarks are required for all students working on Alternate Achievement Standards. This includes academic goals and functional goals, regardless of whether it is a testing year.

1. By the end of the 2019-2020 school year, after reading a text on his instructional level with the use of graphic organizers, Jaden will answer "who, what, when and where" questions with 80% accuracy.

Date of Mastery:

2. By the end of the 2019-2020 school year, after reading a text on his instructional level with the use of graphic organizers, Jaden will answer "why and "how" questions with 80% accuracy.

Date of Mastery:

(Doc. 23-3, p. 50). In IEPs spanning six school years, the district did not complete a single "Date of Mastery." (Doc. 23-3, pp. 23-26, 33-37, 49-50, 81-83; Doc. 23-4, pp. 5-6). Dr. Holley explained that the blanks for "Date of Mastery" may remain blank if a student never masters a benchmark. (Doc. 23-2, pp. 44, 52, tpp. 173, 203).[13] Without the benefit of progress reports, it is impossible to tell whether J.B.

---

[13] Dr. Holley also indicated that dates could be missing because an IEP team might meet to plan the next school year's IEP before the final date for the active IEP's annual goal, "[s]o there may not be a way to put the mastery date in because the team has convened prior to the date that's in

ever achieved or approached one of the annual goals or benchmarks listed in his IEPs. Thus, the Board violated IDEA procedural requirements each of the six school years that J.B. had an IEP because the Board maintained only a small percentage of the documents that the Board should have created and maintained concerning J.B.'s progress.

As to the impact of the Board's procedural violations, Dr. Holley acknowledged that it is important to document mastery of annual goals and benchmarks and that she stressed that importance to teachers. (Doc. 23-2, pp. 44-45, tpp. 173-74, 176). Dr. Holley also acknowledged that information about progress toward annual goals is the stepping-off point for discussions with parents in IEP meetings. (Doc. 23-2, p. 45, tp. 175). Without that information, a parent is in the dark about her child's progress. (Doc. 23-2, p. 45, tpp. 175-76). So is a teacher because a teacher must "progress monitor [a] goal and the instruction [provided] over time to know if it was effective or not." (Doc. 23-2, p. 47, tp. 185).

---

the IEP." (Doc. 23-2, p. 52, tpp. 202-03). The IHO found that this was a "cogent and responsive explanation of why dates of mastery might be missing on IEPs." (Doc. 23-1, p. 62). The Court respectfully disagrees. First, the meeting to which Dr. Holley refers is a meeting that produces an IEP for a subsequent year that should have updated benchmarks with dates for mastery of those benchmarks. The addition of mastery dates to an existing IEP necessarily requires an amendment of the existing IEP because mastery dates will always follow the date on which an IEP team adopts an IEP. Second, many of J.B.'s IEPs had mastery deadlines that preceded the spring IEP team meeting at which J.B.'s IEP team planned his IEP for the following school year. (*See*, *e.g.*, Doc. 23-3, pp. 23-26, 81, 83). Dr. Holley's explanation does not account for these blanks in J.B.'s IEPs.

The discussion in *Escambia County Board of Education v. Benton* informs the Court's analysis of the impact of the procedural violations in this case.  406 F. Supp. 2d 1248 (S.D. Ala. 2005).  In *Benton*, the board of education appealed an IHO's finding that the public school's procedural violations of the IDEA deprived a student who had been diagnosed with autism spectrum order of a FAPE.  *Benton*, 406 F. Supp. at 1254.  The IHO determined that the Board violated the IDEA's procedural requirements because the school did not document the student's progress or mastery of goals and because the goals listed in the student's IEPs were too vague.  *Benton*, 406 F. Supp. at 1255-56.  The IHO found that the procedurally defective IEPs violated the student's statutory right to a FAPE because the defective documentation "render[ed] it impossible" for the student's parents and his IEP team "to track his progress during the school year."  *Benton*, 406 F. Supp. 2d at 1255.  The district court explained:

> The Administrative Decision identifies several non-behavioral aspects of the 2002-03 and 2003-04 IEPs that are contrary to the IDEA.  These defects include lack of notations as to whether Benton had mastered any of his benchmarks, vagueness as to Benton's present level of performance, and lack of measurable annual goals.  According to the Hearing Officer, the mastery dates shortcoming was "[t]he most glaring deficiency" in the IEPs, and was significant because the absence of dates of mastery prevented parents or other IEP team members from ascertaining Benton's progress during the school year.

*Benton*, 406 F. Supp. 2d at 1271.[14]

Relying on 20 U.S.C. § 1414(d)(1)(A)(ii), the district court in *Benton* explained that "an IEP must include 'a statement of measurable annual goals, including benchmarks or short-term objectives,' related to meeting the child's educational needs resulting from his disability." *Benton*, 406 F. Supp. 2d at 1271 (quoting 20 U.S.C. § 1414(d)(1)(A)(ii)). The district court recognized that an IEP does not have to be technically perfect, and the court noted that the "types of IEP procedural defects that have been held to violate a child's right to a FAPE are those that 'result in the loss of educational opportunity,' 'seriously infringe upon the parents' opportunity to participate in the IEP formulation process,' or 'cause[] a deprivation of educational benefits.'" *Benton*, 406 F. Supp. 2d at 1273 (quoting *A.I. ex rel. Iapalucci v. District of Columbia,* 402 F. Supp. 2d 152, 164 (D.D.C. 2005)).

---

[14] For reasons that are not important to this case, the IHO in *Benton* may have placed the burden of proof on the Board with respect to substantive challenges to the student's IEPs. The district court found that the IHO would not have erred in doing so but noted that:

> [e]ven if the Board were correct that the burden of proof should have resided with Benton, there [was] no showing that the Administrative Decision hinged on the allocation of that burden of proof. Nowhere did the Administrative Decision specify that the burden rested with the Board, nor did it state that the ruling in Benton's favor was a product of the Board's failure to satisfy any such burden. Simply put, there is no reason to believe that shifting the burden of proof from the Board to Benton would have made any difference in the Hearing Officer's conclusions regarding behavioral plans.

*Benton*, 406 F. Supp. 2d at 1271 n.24. The same is true with respect to the analysis of the procedural flaws in the student's IEP in *Benton*.

The district court in *Benton* determined that the procedural deficiencies in the administrative record were among the types of defects that deprive a student of a FAPE. The district court reasoned:

> Where dates of mastery are either excluded from IEPs or jotted in as a *pro forma* afterthought at year's end, the IEP team "cannot determine the progress that the child has been making during the school year" towards achieving annual goals and whether adjustments to the program might be necessary.

*Benton*, 406 F. Supp. 2d at 1274 (quoting IHO opinion). The district court stated that the procedural flaws in the student's IEPs were not "trivial, trifling technicalities." *Benton,* 406 F. Supp. 2d at 1274. Instead*,*

> the defects in Benton's IEP went to the suitability of the overall education program, the ability of his teachers and parents to evaluate his execution of that program in a meaningful way, and the ability of the school system and Benton's parents to track his performance. Without dates of mastery for Benton's IEP benchmarks, there is no permanent school record showing his achievements as to those benchmarks over time. Needless to say, it would be extraordinarily difficult for meaningful programs to be fashioned prospectively for Benton without reasonable records to demonstrate where he had been and what he previously had and had not been able to achieve. From an educational standpoint, Benton's teachers, counselors[,] and parents desperately needed the diagnostic, evaluative tool of dates of mastery to understand Benton's status and needs. The omission of such information must necessarily have a detrimental effect on educational programs formed and implemented for Benton on a going forward basis, inasmuch as such programs would be based on imperfect (and/or simply missing) data about Benton's achievement.

*Benton,* 406 F. Supp. 2d at 1274. The district court noted that it was not substituting its judgment for the judgment of school educators or challenging teaching

methodology. Rather, the district court found an unacceptable violation of the student's right to a FAPE in the Board's "inexplicable disregard for minimum practices in preparing and implementing IEPs for Benton." *Benton,* 406 F. Supp. 2d at 1275.

The Board's omission of duty, the district court held, produced "confusion and ignorance in the educational programs prepared for Benton, simply because there [was] no institutional knowledge or meaningful record as to what tangible stepping stones he ha[d] achieved from one year to the next." *Benton,* 406 F. Supp. 2d at 1275. The district court concluded that the "procedural inadequacies in Benton's IEPs resulted in a loss of educational opportunities, deprived his parents of information reasonably needed to enable them to participate in the IEP formulation process, and caused a deprivation of educational benefits, thereby denying him a FAPE." *Benton,* 406 F. Supp. 2d at 1275.

The analysis in *Benton* can be applied verbatim to the record in this case. The IHO here found that the absence of progress reports did not rise to the level of a denial of a FAPE because Ms. Cockrell "felt able to ask other IEP team members for information," but she "chose not to ask questions in IEP team meetings." (Doc. 23-1, p. 62). The IHO stated that the "District's failure to send the required progress reports to Mother did not significantly impede her ability to participate in IEP

teams." (Doc. 23-1, p. 62). J.B.'s school record and the analysis in *Benton* say otherwise.

As the district court explained in *Benton*, the absence of progress reports "deprive[s] parents of information reasonably needed to enable them to participate in the IEP formulation process," and consequently causes "a deprivation of educational benefits, thereby denying him a FAPE." *Benton*, 406 F. Supp. 2d at 1275. Here, Ms. Cockrell knew that something was wrong—she knew her child had been passed from grade to grade, but he could not read, and he could not add and subtract numbers higher than the number 10. (Doc. 23-2, p. 10, tpp. 36-37). But, in the absence of progress reports, Ms. Cockrell did not know whether the goals that the IEP team set for her son each year were adequate to help him improve his skills, whether he needed additional tools for learning in the general education classroom, or whether he needed education outside of the general classroom setting. As in *Benton*, there is no meaningful record as to what tangible stepping-stones J.B. had achieved from one year to the next to help his IEP team design appropriate annual goals and determine the types of accommodations he needed. Without progress reports or information about the extent to which J.B. was advancing towards mastery of goals, Ms. Cockrell did not know what questions to ask of Ms. Holley or J.B.'s IEP team. She could do no more than what she did—ask the district's experts, her son's educators, to explain why her son could not read or do simple math and seek

legal assistance to help her understand what more to ask and how to pursue a FAPE for her son.

The IHO found that despite the district's procedural violations, J.B. was not deprived of a FAPE because J.B. had "never been held back in a grade level" and because J.B.'s IEPs "reflect that [his] goals were not the same from year to year and [were] written based upon his deficits identified from evaluations." (Doc. 23-1, pp. 61, 63; *see also* Doc. 23-1, p. 57 (noting that J.B. had not been retained in a grade level since kindergarten); Doc. 23-2, p. 7, tp. 23). When tested against the evidence, these findings lack substance and fail to support the IHO's conclusion.

As to the Board passing J.B. each school year and not requiring him to repeat grades, Ms. Cockrell testified that when she saw J.B. struggling to read in fourth grade, she visited his teacher and asked to see her gradebook. At the time, J.B. had As and Bs on his report card, but the teacher had given him zeros on his work. The teacher told Ms. Cockrell that she had to pass J.B. as a matter of school policy. (Doc. 23-2, pp. 7, 24-25, tpp. 22-23, 93-95). J.B.'s quarter grades for the 2019-20 school year when he was in sixth grade—the only grades the Board maintained in J.B.'s record—indicate that he was receiving passing grades even though his numerical grades for quizzes and homework indicate that he should have been failing. (Doc. 23-3, pp. 59-63). For example, in his first quarter social studies class, not counting the entries for which J.B. had no points (not even a 0) and including his score of 100

for class participation, J.B. had an average of 57/100, but he received a 70%/C on his report card. (Doc. 23-3, p. 60).[15] He did not complete two benchmark assessments, and he received a 41/100 on a third, but he still received a C for the quarter. (Doc. 23-3, p. 60). In the third quarter, in math, though J.B. did not receive a score for any of the four math facts quizzes on his report and had an average of just under 50 for the four entries (two classwork grades, one homework grade, and one benchmark test), for the which he did receive scores, his teacher gave him a quarterly grade of 60.69%/D. (Doc. 23-3, p. 62). The teacher may not have included in her average the homework assignment on which she gave J.B. a 0; the Court included the 0 when averaging J.B.'s four math scores. (Doc. 23-3, p. 62). J.B. did receive an F in Language Arts for the first quarter, and he earned that F, receiving a 25/100 for the only assignment that he appears to have completed; he did not have grades for nine other assessments during the quarter. (Doc. 23-3, p. 60). Thus, though the district did not retain J.B. in any grade, the evidence suggests that teachers gave J.B. passing grades that he did not earn.[16]

---

[15] To calculate this average, the Court did not include the three entries for which J.B. received no score, and the Court treated the 50/50 score as 100/100 so that all eight scores used in the average were scores out of 100. (Doc. 23-3, p. 60).

[16] As additional evidence of educators reimagining J.B.'s performance, the Court relies on J.B.'s Student Interest Survey. As noted earlier, J.B. completed a copy of the survey, and someone from the district, most likely the district's special education manager, completed a copy of the survey. (Doc. 23-3, pp. 65, 68-69; Doc. 31). Most of the answers on the two surveys match or are extremely similar, but there is a notable exception. J.B. wrote that his favorite song or musical artist was hip hop. The district special education instructor wrote that J.B. favored classical music.

With respect to the IHO's finding that J.B.'s annual goals in his IEPs "were not the same from year to year," the evidence shows that in his 2017-18 IEP, in math, J.B.'s Measurable Annual Goal was by May 2018 to complete multi-digit addition and subtraction problems and basic division problems with regrouping and borrowing with 75% accuracy.  (Doc. 23-3, p. 25).  His annual math goal in his 2018-19 IEP was the same, to be achieved by May 2019.  (Doc. 23-3, p. 35).  In his 2022-23 IEP, when J.B. was in ninth grade, his Measurable Annual Goals in math were by October 2022 to "add within 1000 using place value strategies with 70% accuracy" and by February 2023 to "subtract within 1000 using place value strategies with 70% accuracy."   (Doc. 23-4, p. 27).   There is no meaningful difference in J.B.'s annual math goals in these IEPs, which span the more than five years in which J.B. received special education.  In reading in his 2017-18 IEP, J.B. had an annual goal of blending and stretching unfamiliar words with 70% accuracy by the end of the third quarter.  (Doc. 23-3, p. 24).  In reading in his 2022-23 IEP, J.B. had an annual goal of blending words at second grade level with 70% accuracy by October 2022.  (Doc. 23-3, p. 24).  Again, there is no meaningful difference in these goals.

---

(Doc. 23-3, pp. 65, 68).  The evidence is consistent with a finding that the information in reports that teachers prepared for J.B. is not entirely reliable.

In discussing J.B.'s grades and the significant similarities between the annual goals in his first and last IEPs, the Court does not suggest that the Board had to maximize J.B.'s potential; the Board had no such obligation. *Weiss*, 141 F.3d at 998. And, as in *Benton*, the Court is not substituting its judgment for the judgment of school educators or challenging teaching methodology. Rather, the record here, like the record in *Benton*, demonstrates that the procedural flaws in J.B.'s IEPs resulted in a loss of educational opportunities, deprived Ms. Cockrell of information reasonably needed to enable her to participate in the IEP formulation process, and caused a deprivation of educational benefits, thereby denying J.B. a FAPE. *Benton*, 406 F. Supp. 2d at 1275.

## V.

For the reasons stated above, the Court denies the Board's request for judgment on the administrative record in its favor on Ms. Cockrell claim that the Board denied J.B. a FAPE by failing to properly document J.B.'s progress by omitting dates of mastery in J.B.'s IEPs and by failing to provide 22 of the 24 required progress reports. (Doc. 25). The Court affirms the IHO's decision in all other respects and directs the Clerk to please TERM Doc. 25.[17]

---

[17] In her brief in opposition to the Board's motion for judgment on the record, Ms. Cockrell argued that J.B.'s IEPs were not based on peer-reviewed research. (Doc. 26, pp. 16-17). The IDEA requires that an IEP include:

> a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be

**DONE** and **ORDERED** this September 27. 2024.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

provided to the child, or on behalf of the child, and a statement of the program
modifications or supports for school personnel that will be provided for the child.

20 U.S.C. § 1414(d)(1)(A)(i)(IV).  J.B.'s IEPs contain lists of "Special Education and Related
Services." (Doc. 23-3, pp. 38, 51–2, 84; Doc. 23-4, pp. 8, 29–30). Ms. Cockrell asserts: "Nowhere
is there a document that indicates the use of peer-reviewed research." (Doc. 26, p. 17).  The Court
has not found a provision in the IDEA that requires specific identification of the peer-reviewed
research on which an IEP team relies, and Ms. Cockrell has not carried her burden to establish that
J.B.'s IEP team did not rely on peer-reviewed research in developing J.B.'s IEPs.  Therefore, this
argument is not persuasive.  Ms. Cockrell raised other issues in her complaint, (Doc. 1), but she
did not mention them in her brief, (Doc. 26).  Therefore, she cannot rely on those issues in opposing
the Board's motion for judgment on the record.